[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

_____

No. 20-14350

Non-Argument Calendar

_____

JEFFREY HOWARD SHARPE,

Plaintiff-Appellant,

*versus*

COMMISSIONER, SOCIAL SECURITY ADMINISTRATION,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Southern District of Georgia
D.C. Docket No. 2:19-cv-00027-LGW-BWC

_____

Before WILSON, ROSENBAUM, and JILL PRYOR, Circuit Judges.

PER CURIAM:

Jeffrey Sharpe appeals from a district court order affirming the decision of the Commissioner of the Social Security Administration to deny his application for a period of disability and disability insurance benefits. Sharpe argues that the administrative law judge ("ALJ") erred in assessing his residual functional capacity by determining that he occasionally could interact with supervisors and coworkers. After careful consideration, we conclude that substantial evidence does not support the ALJ's assessment that Sharpe occasionally could interact with supervisors and coworkers. Accordingly, we reverse the district court's judgment and remand to the district court with instructions to remand to the Commissioner.

## I.    FACTUAL BACKGROUND

In 2011, after approximately 20 years of service, Sharpe retired from the Navy. Upon his retirement, the Department of Veterans Affairs ("VA") determined that Sharpe was partially disabled due to service-connected impairments and awarded him benefits. In 2016, Sharpe applied to the Social Security Administration ("SSA") for disability insurance benefits and a period of disability. In his application, Sharpe claimed that he was disabled

due to various physical and psychological impairments.[1] He asserted that he was disabled as of October 1, 2015,[2] and remained disabled through December 31, 2016, his date last insured. After the SSA denied Sharpe's application, he requested and received a hearing before an ALJ.

A.    *The ALJ Hearing*

At the hearing, the ALJ heard testimony from Sharpe and his wife and reviewed written questionnaires they completed. The ALJ also reviewed Sharpe's medical records and the opinion of a state agency consultant.

1.    Testimony and Statements from Sharpe and His Wife

The testimony and questionnaires from Sharpe and his wife reflected that since retiring from the Navy, Sharpe suffered from anxiety and rarely, if ever, left his home or interacted with anyone outside his immediate family.

---

[1] Because Sharpe's arguments on appeal relate to the ALJ's assessment of his limitations due to his psychological impairments, we discuss the evidence related to these impairments only.

[2] Under the relevant regulations, Sharpe could receive benefits beginning "up to 12 months immediately before the month in which [his] application [was] filed." 20 C.F.R. § 404.621(a)(1). Given the date of his application, Sharpe was eligible for benefits beginning on October 1, 2015.

On a typical day, Sharpe would wake up and dress himself. He would need reminders to shower and take his medications. Sharpe would spend most of the day inside the house, watching television or playing video games. Sharpe would go outside his home into his backyard to tend to his pepper plants.

Sharpe would perform only limited household chores. He was unable to prepare his own meals or do much housework or yard work. He would clear dishes after he ate meals and, if reminded, feed the families' fish and rabbits. The only other household chore he would perform is that about once a year Sharpe would repair the family's computer when it broke. Although the repair would only take about 30 minutes, Sharpe would need "constant reminding" to complete this task. Doc. 7-7 at 25.[3] Sharpe depended on his wife to handle all the family's finances and pay their bills.

Sharpe almost never left the home he shared with his wife and two children. Over a six-year period, he departed his home no more than 12 times. When Sharpe tried to leave his home, he would become agitated and angry. He would experience panic attacks, cry, and end up sick in bed for days.

Sharpe had only limited contact with people outside his immediate family. He would not have visitors to his home. If someone rang the doorbell, Sharpe would not answer. If someone

---

[3] "Doc." numbers refer to the district court's docket entries.

called the home phone, he would let the phone ring. He would answer only if he could tell from caller identification that it was his wife calling.

After he retired from the Navy, Sharpe enrolled in an online university and earned a college degree. He relied on his wife to help him complete the degree. There is no indication that Sharpe left his home to complete his degree.

Sharpe missed many important events due to his inability to leave his home. He attended none of his daughter's marching band performances and missed her high school graduation.[4] When Sharpe's father died, he was unable to leave his house to attend the funeral.

Due to his inability to leave the house, Sharpe rarely received medical care. He refused to submit to medical procedures unless he felt the procedure was necessary to treat a life-threatening condition. Sharpe's wife repeatedly tried to schedule medical appointments for him. But most times Sharpe would get anxious before the appointment and be unable to attend. At one point, the VA attempted to set up phone counseling appointments for him. But Sharpe became upset and refused to talk on the phone.

---

[4] The record also included a written statement from Sharpe's daughter, who recently graduated from high school, detailing his limitations and the events that he had missed.

2.    Sharpe's Medical Records

The ALJ also reviewed Sharpe's medical records. Because Sharpe saw no medical providers during the approximately five-year period between his discharge from the Navy and his date last insured, there were no records from this period. The medical records before the ALJ that related to Sharpe's psychological impairments all came from the period after his date last insured. The records included an examination report from Dr. William Corey, Ph.D., and treatment notes and a medical questionnaire from psychiatrist Dr. Jerry Co, M.D.

In March 2017, approximately three months after Sharpe's date last insured, Corey performed a psychological examination, which lasted approximately three hours. As part of the examination, Corey interviewed Sharpe about his current symptoms as well as his health history. Sharpe claimed that he suffered from anxiety as well as insomnia. He described how his mental health limitations left him unable to leave his house.

As part of the examination, Corey reviewed Sharpe's medical and mental health history. Sharpe explained that since retiring from the military, he had not received medical treatment because he was unwilling to leave his house to visit a doctor's office. He reported that before he retired from the military, he experienced "anxiety" and "social phobia." Doc. 7-9 at 32–33. During this period before his retirement, Sharpe stated, his anxiety "appear[ed] to occur when he [was] in large groups of people." *Id.* at 33.

During the examination, Corey observed Sharpe's behavior. Corey noted that Sharpe did not make eye contact during the examination, displayed little spontaneous speech, and had a distant and guarded attitude. But Corey also found that Sharpe was able to communicate effectively and that it was easy to establish a rapport.

Also during the examination, Corey performed several diagnostic tests to measure Sharpe's intelligence as well as his concentration, attention, and memory. Corey estimated Sharpe's IQ to be below average. Corey observed "significant" differences between Sharpe's verbal comprehension, on the one hand, and his working memory and processing speed, on the other hand. *Id.* at 35. After accounting for these differences, Corey opined that Sharpe's full-scale IQ was in the "borderline range." *Id.*

Based on the examination, Corey diagnosed Sharpe with panic disorder, agoraphobia, and avoidant personality disorder and determined that Sharpe faced limitations due to his mental impairments. Corey found that Sharpe was "quite limited" in his ability to handle abstraction and had impaired recent and remote memory. *Id.* at 34. Corey opined that Sharpe was "severely impaired" in his capability to interact appropriately with others, "moderately impaired" in his ability to adapt to workplace stressors, and "mildly impaired" in his ability to understand and remember detailed instructions and to sustain attention for extended periods of time. *Id.* at 35. Corey concluded that Sharpe's anxie-

ty disorder was "treatable" but noted that his reluctance to inter-act with others was "more chronic." *Id.*

Several months later, Sharpe began receiving treatment from Co, a VA psychiatrist. Over an approximately nine-month period, Sharpe saw Co five times. During this period, Co diagnosed Sharpe with generalized anxiety disorder, panic disorder with agoraphobia, insomnia, REM sleep disorder, mood disorder, and somatoform disorder.[5] Co treated Sharpe with medication; Sharpe declined psychotherapy treatment.

Even with medication, Sharpe reported no improvement. He remained unable to leave his house. In addition, he reported significant side effects from the medications.

Co changed Sharpe's medication multiple times, trying to find medications that would control Sharpe's symptoms. But after approximately nine months of treatment, it was concluded that "medication trials have been unsuccessful to address all of [Sharpe's] symptoms, including his difficulty in leaving . . . home for ordinary activities." Doc. 7-13 at 53.

---

[5] Somatoform disorder "is characterized by an extreme focus on physical symptoms—such as pain or fatigue—that causes major emotional distress and problems functioning." Mayo Clinic, Somatic Symptom Disorder, available at https://www.mayoclinic.org/diseases-conditions/somatic-symptom-disorder/symptoms-causes/syc-20377776 (last accessed Jan. 13, 2022).

20-14350                Opinion of the Court                9

After Sharpe's fifth appointment, Co completed a Mental Impairment Questionnaire, addressing the extent of Sharpe's impairments. In the questionnaire, Co reported that Sharpe's current Global Assessment of Functioning ("GAF") score was 35[6] and that he had a poor prognosis.

In the questionnaire, Co opined about Sharpe's abilities to perform work-related activities on a day-to-day basis in a work environment. He reported that Sharpe had no useful ability to perform a number of work-related functions, including accepting instructions and responding appropriately to criticism from supervisors, getting along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, and dealing with normal work stress. Co concluded that Sharpe had extreme

[6] The GAF is a numeric scale used to rate an individual's overall level functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32–33 (4th ed. 2000) ("DSM-IV"). Sharpe's score of 35 indicates that he was experiencing a "major impairment in several areas such as work or school, family relation, judgment, thinking[,] or mood." Doc. 7-2 at 27.

The DSM abandoned the use of GAF scoring, noting "its conceptual lack of clarity" and "questionable psychometrics in routine practice." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 16 (5th ed. 2013) ("DSM-V"). After the DSM-V was published, the SSA issued a directive to ALJs instructing them to consider GAF scores as medical opinion evidence but emphasizing that GAF scores should not be considered in isolation because the GAF is only a snapshot about a person's level of functioning. Soc. Sec. Admin., Administrative Message 13066 (July 22, 2013).

limitations in maintaining social functioning, explaining that Sharpe had "poor cognitive processing" as well as "avoidance symptoms" that precluded him from working with others. *Id.* at 11. Co also indicated that in the past year Sharpe had experienced four or more episodes of decompensation, each lasting at least two weeks. Co ultimately opined that Sharpe's anxiety-related disorder left him with a "complete inability to function independently outside" of his home. *Id.* at 13. Co also determined that Sharpe had been unable to function or work due to his psychological impairments even before he retired from the Navy.

3.      The State Agency Consultant Opinion

The ALJ also reviewed an opinion from Dr. William Gore, Ph.D., a state agency consultant who reviewed Sharpe's medical records but never treated or examined him. Gore reviewed Sharpe's file in July 2017, after Corey had examined Sharpe but before Co had begun to treat him.[7]

Based on his review of Sharpe's medical records, Gore opined that Sharpe had moderate, but not marked, limitations in interacting with others. Gore determined that Sharpe was moderately limited in his ability to interact with the general public but not significantly limited in his ability to get along with coworkers

---

[7] Before Sharpe saw Corey, another state agency consultant reviewed Sharpe's file and determined there was insufficient evidence to assess his psychological impairments.

or peers without distracting them or exhibiting behavioral extremes. Gore further opined that Sharpe "may need to work in an environment with minimal social interaction" and "would benefit from working with a nonconfrontational supervisor." Doc. 7-3 at 35.

B.    *The ALJ's Decision*

In a written decision, the ALJ applied the five-step sequential evaluation process and determined that Sharpe was not disabled. At the first step, the ALJ found that Sharpe had not engaged in substantial gainful activity during the period from the alleged onset of disability through his date last insured. At the second step, the ALJ concluded that as of the date last insured Sharpe had severe impairments, including anxiety disorder, mood disorder, somatoform disorder, agoraphobia, avoidant personality disorder, and insomnia.

At the third step, the ALJ found that through the date last insured Sharpe had no impairment or combination of impairments that met or medically equaled the severity of a listed impairment. To meet or medically equal the relevant listings, Sharpe had to have, among other things, extreme or marked limitations in at least two of the following areas of functioning: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing himself. *See* 20 C.F.R. pt. 404, subpart P, app. 1, § 12.00(A)(2)(B)(b). The ALJ found that Sharpe had a marked limitation in only one area: interacting with others. With regard to

limitations in interacting with others, the ALJ found that Sharpe's "primary problem appear[ed] to be severe social anxiety that exacerbated after his retirement from the military to the point that he has very little interaction with others, but it appears to mostly occur in large crowds of people." Doc. 7-2 at 22. To support this conclusion, the ALJ cited Corey's report.

Because Sharpe's impairments did not meet or medically equal the severity of a listed impairment, the ALJ moved on to step four of the analysis and assessed Sharpe's residual functional capacity. The ALJ found that Sharpe could perform light work subject to certain limitations. The limitations included that Sharpe could perform only unskilled, routine, and repetitive tasks; have no more than occasional interaction with supervisors and coworkers; and have no interaction with the general public. Based on this residual functional capacity, the ALJ determined that Sharpe was unable to perform his past relevant work.

In assessing Sharpe's residual functional capacity, the ALJ considered statements from Sharpe and his family about Sharpe's symptoms. The ALJ found that their statements concerning the intensity, persistence, and limiting effects of Sharpe's symptoms were "not entirely consistent with the medical evidence and other evidence in the record" and gave them only partial weight. *Id.* at 24.

In the decision, the ALJ discussed the weight assigned to the opinions from Corey, Co, and Gore. The ALJ generally adopted Gore's assessments of Sharpe's mental limitations, except

to find that Sharpe had marked limitations in interacting with the public. The ALJ explained that with this modification Gore's assessment was consistent with Corey's. The ALJ then stated that Sharpe should have no interaction with the public because Sharpe had "testified" that he was limited "particularly with regard to larger crowds." *Id.* at 27. The ALJ provided no citation to the record where Sharpe had testified that he was limited with respect to larger crowds only and was not similarly restricted with respect to smaller groups of people, such as supervisors or coworkers.

The ALJ gave no weight to Co's opinions. The ALJ concluded that Co's opinion that Sharpe's potential for improvement was poor was inconsistent with his treatment notes, which showed an ongoing conservative treatment history involving only "medication management." *Id.* In addition, the ALJ found that Co's opinion that Sharpe had poor cognitive abilities was not supported by evidence in the record, which showed that Sharpe was able to engage in "substantial activities with computers, bank accounts, and video games." *Id.*

At step five, the ALJ determined that given Sharpe's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national

economy that he could perform. The ALJ thus concluded that Sharpe was not disabled.[8]

## C.    District Court Proceedings

Sharpe filed an action in federal district court, asking the court to reverse the Commissioner's decision. The magistrate judge recommended that the district court affirm the Commissioner's decision. Sharpe objected. The district court overruled the objection, adopted the report and recommendation, and affirmed the Commissioner's decision. This is Sharpe's appeal.

## II.    STANDARD OF REVIEW

When, as here, an ALJ denies benefits and the Appeals Council denies review, we review the ALJ's decision as the Commissioner's final decision. See Doughty v. Apfel, 245 F.3d 1274, 1278 (11th Cir. 2001). We review the Commissioner's decision to determine whether it is supported by substantial evidence, but we review de novo the legal principles upon which the decision is based. Moore v. Barnhart, 405 F.3d 1208, 1211 (11th Cir. 2005). Substantial evidence refers to "such relevant evidence as a reasonable person would accept as adequate to support a conclusion." Id. "We may not decide facts anew, reweigh the evidence, or substitute our judgment for that of the Commissioner." Dyer v. Barnhart, 395 F.3d 1206, 1210 (11th Cir. 2005) (alteration

---

[8] Sharpe requested the Appeals Council review the ALJ's decision, but the Appeals Council denied his request for review.

adopted) (internal quotation marks omitted). We must affirm the Commissioner's decision if it is supported by substantial evidence, "even if the proof preponderates against it." *Id.* (internal quotation marks omitted).

## III.    LEGAL ANALYSIS

A disabled individual may be eligible for disability insurance benefits. 42 U.S.C. § 423(a)(1). To be eligible, a claimant must prove that he became disabled on or before the date for which he was last insured. *See Moore*, 405 F.3d at 1211. Because Sharpe's last insured date was December 31, 2016, he must show a disability on or before that date.

To determine whether a claimant is disabled, an ALJ applies a five-step sequential evaluation process. The ALJ asks whether the claimant: (1) is engaging in substantial gainful activity; (2) has a severe and medically determinable impairment or combination of impairments; (3) has an impairment or combination of impairments that satisfies the criteria of a listing; (4) can perform her past relevant work in light of her residual functional capacity; and (5) can adjust to other work in light of her residual functional capacity, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4).

In this case we are concerned with the ALJ's assessment of Sharpe's residual functional capacity. Sharpe argues that the ALJ erred in concluding that he occasionally could interact with

coworkers and supervisors. We agree that substantial evidence does not support this finding.[9]

The record reflects that due to his anxiety and other psychological impairments, Sharpe was unable to interact with anyone outside of his immediate family. Over a six-year period, he left his home no more than a dozen times. To avoid interacting with others, he would refuse to answer the door to his home, pick up the phone if it was ringing, or allow his children to have friends over. His anxiety was so severe that he was unable to leave his home to attend his daughter's high school graduation or his father's funeral. When faced with having to interact with someone outside his family, Sharpe would become agitated and angry and end up sick in bed for days. Given that Sharpe's social network did not extend beyond his immediate family, we cannot say that the record before us contains evidence that a reasonable person would accept as adequate to support the conclusion that Sharpe was able to have occasional interaction with supervisors and coworkers in a working environment.

---

[9] Sharpe also argues that the ALJ erred in assigning no weight to the opinion of Co, his treating psychiatrist. Because the case must be remanded to the ALJ on the ground that substantial evidence does not support the ALJ's determination that Sharpe remained able to occasionally interact with supervisors and coworkers, we do not reach the question of whether the ALJ erred in assigning no weight to Co's opinion.

The ALJ nevertheless concluded that Sharpe occasionally could interact with a supervisor or coworkers. To support this conclusion, the ALJ cited to Corey's report. But Corey's report reflected only that Sharpe stated that when he retired from the Navy, six years earlier, he had discrete periods of anxiety that occurred when "he [was] in large groups of people." Doc. 7-9 at 33. Setting aside whether this statement supported an inference that, at the time he retired from the Navy, Sharpe remained able to have occasional interactions with supervisors or coworkers, nothing in Corey's report supports the conclusion that *during the relevant time period*, which was several years after Sharpe's retirement, he experienced anxiety only when he was in large groups and would be able to interact occasionally with supervisors or coworkers. Rather, Corey's report reflects that during the relevant time period, Sharpe was generally unable to leave his home or interact with anyone outside his immediate family.[10]

The Commissioner argues that other medical evidence supports the ALJ's assessment because it "show[s] that [Sharpe] claimed his anxiety occurred when he was in large groups." Ap-

---

[10] To support the residual functional capacity assessment that Sharpe could occasionally interact with coworkers or a supervisor, the ALJ also said Sharpe had testified that his social anxiety mostly occurred in crowds. But the ALJ provided no citation to the record where Sharpe provided such testimony. Having carefully reviewed the record, we see no testimony indicating that Sharpe was able to interact with anyone outside his immediate family during the relevant time period.

pellee's Br. at 22. The Commissioner cites to a report from a medical provider who examined Sharpe to determine his physical limitations and a treatment note from Co. But the ALJ did not rely on either piece of evidence to support the conclusion that Sharpe experienced anxiety only when in large crowds or remained able to have occasional interactions with coworkers or supervisors, so we may not affirm on this basis. *See Owens v. Heckler*, 748 F.2d 1511, 1516 (11th Cir. 1984) (explaining that we may not affirm the Commissioner's decision "simply because some rationale might have supported the ALJ's conclusion. Such an approach would not advance the ends of reasoned decision making." (footnote omitted)); *see also Newton v. Apfel*, 209 F.3d 448, 455 (5th Cir. 2000) ("The ALJ's decision must stand or fall with the reasons set forth in the ALJ's decision . . . .").

Even if we could consider this rationale that the ALJ did not offer, we are not persuaded that either piece of evidence supports the Commissioner's position. First, the report from the examining medical provider the Commissioner cites reflects that Sharpe and his wife reported that he experienced panic attacks and generally stayed at home. Sharpe's wife told this provider that he generally experienced about two panic attacks a week when at home but had them "more often" when he was "among people." Doc. 7-9 at 26. At most, this statement reflects that being around people outside his household triggered Sharpe's panic attacks. The statement does not specify the number of people; thus, it

does not support the conclusion that Sharpe's panic attacks were triggered only when he was in a large group.

Second, Co's treatment notes do not support the Commissioner's assessment of Sharpe's limitations. In the cited treatment note, Co summarized Sharpe's history and noted that Sharpe's wife reported that he had particularly severe episodes "only" when he was in "social situations." Doc. 7-13 at 16. Nothing in this statement indicated that Sharpe could function so long as the social situation did not involve a large group.

Although our standard of review is deferential, it does not mean that we "merely rubber[]stamp" an ALJ's decision. *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1257 (11th Cir. 2019). We "must scrutinize the record as a whole to determine if the decision reached is reasonable and supported by substantial evidence." *Id.* (internal quotation marks omitted). Here, we conclude that the record does not contain such evidence that a reasonable person would accept as adequate to support the ALJ's conclusion that Sharpe remained able to interact occasionally with co-workers or supervisors. We therefore conclude that the ALJ erred in assessing Sharpe's residual functional capacity, and the case must be remanded.[11]

---

[11] The record reflects that if Sharpe could not sustain at least occasional interaction with coworkers or supervisors, there were insufficient jobs in the national economy that he could perform.

## IV.    CONCLUSION

For the reasons stated above, we reverse the judgment of the district court and remand with instructions to remand to the Commissioner.

**REVERSED AND REMANDED.**