[DO NOT PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 23-12894

Non-Argument Calendar

_____

NICOLE K. BLACKMON,

Plaintiff-Appellant,

*versus*

COMMISSIONER OF SOCIAL SECURITY,

Defendant-Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 6:22-cv-01283-RBD-DCI

_____

Before WILSON, BRANCH, and LUCK, Circuit Judges

PER CURIAM:

Nicole Blackmon appeals the district court's affirmance of the Social Security Administration's ("SSA") denial of disability insurance benefits ("DIB"). On appeal, Blackmon argues (A) that the Administrative Law Judge ("ALJ") erred in its Residual Functional Capacity assessment ("RFC") by failing to include limitations (1) reflecting her numerous medically related absences and (2) regarding her mental capacity; and (B) that the Appeals Council ("AC") erred in its determination that further evidence she submitted regarding her hip impairment was not chronologically relevant. After careful review, we affirm.

## I.    Background

In March 2020, Blackmon filed a Title II application for a period of disability and DIB. She alleged the following ten disabilities: "[s]ystemic [s]arcoidosis lungs/cardiac w/PFO"; "[o]bstructive [s]leep [a]pnea"; "[d]iabetes [i]nsipidus"; "[d]iabetes [m]ellitus w/insulin"; "[s]pinal stenosis with failed laminectomy"; "spinal bulging discs/lumbar radiculopathy"; "[a]djustment disorder w/mixed anxiety and depressed mood"; "[e]mpty [s]ella [s]yndrome"; "[a]drenal insufficiency"; and "[h]yperthyroidism." While she initially alleged an onset date of June 15, 2019, Blackmon amended her disability onset date to September 29, 2020, after the ALJ highlighted that she had engaged in substantial gainful activity

through the third quarter of 2020. She was 50 years' old at the time of the amended alleged onset date.

This background section will cover only the facts and procedural history relevant on appeal,[1] including: (A) evidence related to Blackmon's absenteeism; (B) evidence related to Blackmon's mental limitations; (C) the ALJ's decision; (D) additional evidence submitted to the AC regarding Blackmon's hip replacement; and (E) the district court's ruling on appeal. Each will be discussed in turn.

A. *Medically-related absences*

Blackmon submitted records showing numerous inpatient hospitalizations, emergency room visits, and doctor's appointments (collectively, "medical events"), the quantity of which are relevant to Blackmon's argument on appeal that her absenteeism should have factored into her RFC. Specifically, Blackmon had medical events on at least 71 of the days between June 15, 2019 (Blackmon's original onset date), and April 22, 2021 (Blackmon's last recorded medical event before filing), for an average of 3.14 times per 30-day period. However, looking to the time period between September 29, 2020, (Blackmon's amended onset date) and April 22, 2021, Blackmon had medical events on only eight days, for an average of just over 1 event per 30 days. And Blackmon only had multiple medical events in one of the relevant

---

[1] For instance, we need not cover the extensive medical records dealing with Blackmon's physical impairments, because she does not challenge the ALJ's findings on these impairments on appeal.

months.  Notably, at a hearing on Blackmon's claim, the ALJ asked the Vocational Expert ("VE") "[i]f I have an individual who is going to be tardy, absent, leave early, or any combination of those and if that's greater than one day a month on a regular and ongoing basis would there be any jobs for that individual?" The VE responded no.

*B. Mental Limitations*

Blackmon submitted evidence of various medical appointments and evaluations related to her mental limitations.

1. Tess Wilson's evaluations

On September 28, 2020, Blackmon attended a telehealth appointment with Tess Wilson, a licensed independent social worker ("LISW").  Blackmon reported that she was doing okay, but that she was struggling with ongoing pain that negatively impacted her mood.  She indicated that she had been trying to engage in exercises that were recommended by a physical therapist.  On mental status examination, Wilson noted that Blackmon had a "euthymic" mood and "congruent" affect, that her thought content and speech were normal, and that her thoughts were linear, goal directed, and coherent. Blackmon reported difficulty falling asleep, but had "no specific plan[] to harm [her]self."  Wilson assessed Blackmon as having "[a]djustment disorder with mixed anxiety and depressed mood."

Following the amended alleged onset date, on October 2, 2020, Blackmon attended a telehealth psychotherapy session with Wilson for her depression.  She reported that she was okay, but

"not great." She reported that she recently had her grandchildren over and that it was beneficial for her mood. She continued to have "negative/cyclic[al]" thoughts surrounding her pain. On mental status examination, Wilson noted that Blackmon's mood was irritable, and that her affect was "mood congruent." She exhibited normal speech; fair insight and judgment; and had linear, goal directed and coherent thought processes. However, she was having difficulty falling asleep. She had "no specific plan[] to harm [her]self."

On October 15, 2020, Wilson saw Blackmon again and Blackmon reported that she was doing okay, but that she had been dealing with a number of stressors recently. Specifically, she reported that she had lost her job and that her mother was moving out, so she was having to make a lot of changes. She indicated that she had been able to engage in "thought-changing strategies" and reported that she had been able to reduce her pain from "90% to 70%," which allowed her to sleep. She also reported getting a dog, which had been beneficial in getting her up and moving and also had helped with her mood. Wilson conducted a mental status examination and noted that (1) Blackmon had a "euthymic" mood and "congruent" affect; (2) her thought content and speech were normal; and (3) her thoughts were linear, goal directed, and coherent. Blackmon again indicated that she did not have any plans to harm herself.

2.  Dr. Bard's evaluation

On September 22, 2020, Dr. E.M. Bard, Ph.D., a consultative psychological examiner, evaluated Blackmon, who was referred for a psychological consultative assessment related to her disability proceedings.  Blackmon reported that since November 2018, she was employed by Alpha Phi Alpha Co. as a full-time property manager.  When asked whether she had experienced any mental conditions that interfered with her work duties generally, Blackmon reported that since approximately 2012 she "had bouts of depression and anxiety" where she did not want to go to work.  Blackmon told Dr. Bard that she met with Wilson on a regular basis since June 2019, and that her treatment plan involved "coping skills to help [her] recognize ways [she] can change a situation."  When describing her depression, Blackmon became tearful, stating that both her depression and anxiety have caused her to have limitations in her work schedule.  Her symptoms included not being able to get out of bed, not being able to answer the phone, and becoming socially withdrawn.  Blackmon reported that she was not taking any psychotropic medications, but, in the past, she had been prescribed Xanax, which she did not like.  She reported that on one occasion in 2013 or 2014, she had attempted to overdose in the hospital while she was being treated for meningitis, but she denied any current suicidal ideation.

As to her activities of daily living, Blackmon reported that her mother handled the routine household chores, but she was able to pay bills, manage her checking account, count money, make

change, and fold laundry.  She was able to handle her own personal grooming activities and was able to read the local newspaper with comprehension, tell time, make appointments, manage her mail, and operate a computer. She provided childcare for her two-year-old granddaughter around two times a week. For hobbies, she was working on a family tree and enjoyed watching television.

In conducting a mental status examination, Dr. Bard noted that Blackmon's speech was relevant and coherent, and her eye contact was satisfactory.  She was cooperative during the interview, although tearful at times.  Her mood was somewhat unhappy, her affect was congruent, and she expressed concern regarding her deteriorating physical health.  Dr. Bard noted that Blackmon "did not exhibit any overt characteristics of anxiety." Dr. Bard also administered the Mini-Mental State Examination ("MMSE") to assess Blackmon's mental status and cognitive state. Blackmon's overall performance was within the "Average" range and her intellectual ability was estimated to be within the "Above Average range."  Dr. Bard opined that Blackmon was able to make decisions and demonstrate problem solving skills.  Dr. Bard diagnosed Blackmon with (1) unspecified depressive disorder, and (2) adjustment disorder with chronic anxiety.

Dr. Bard also completed a functional assessment and found that the only limitation that Blackmon had was that she was slightly below average in the area of dealing with normal pressures in a competitive work setting.  Specifically, Dr. Bard found that Blackmon was "self-focused, concerned regarding her

deteriorating health and uncertain regarding her future" and that her mental health issues could impact her ability to deal with employment expectations to a mild degree. Dr. Bard opined that, if Blackmon was required to return to her original work-site, her mental health symptoms would be exacerbated.

### 3. Dr. Mikalov's evaluation

On June 24, 2020, Dr. Abraham Mikalov, M.D., performed an initial disability determination and RFC assessment. Notably, Dr. Mikolav determined that Blackmon had depressive, bipolar, and related disorders, but that they were non-severe. As to Blackmon's ability to perform past relevant work, Mikalov indicated that she could perform her previous role in customer service.

### 4. Dr. Haskins's evaluation

Dr. Kristen Haskins, Psy. D., reviewed the "paragraph B" criteria[2] and found that, while Blackmon had a mild limitation in the domain of adapting or managing oneself, no mental residual functional capacity ("MRFC") was associated with this claim.

---

[2] Per the social security regulations, a claimant's degree of functional limitations is rated in four areas, otherwise known as the "paragraph B" criteria. 20 C.F.R. § 416.920a(c)(3). These domains are the claimant's ability to: understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage oneself. *Id.*, Pt. 404 Subpt. P., App. 1, § 12.00(E)(1)-(4).

5. Dr. Waggoner's evaluation

On January 20, 2021, at the reconsideration level of review, Dr. Cynthia Waggoner, Psy. D., found that Blackmon had mild limitations in the domain of adapting or managing oneself, but had no severe impairment.

*D. ALJ decision*

On August 16, 2021, after going through the SSA's five-step sequential evaluation process,[3] the ALJ issued a final decision, finding that Blackmon was not disabled. At step one, the ALJ found that Blackmon had not engaged in substantial gainful activity since September 29, 2020, the amended alleged onset date.

At step two, while the ALJ found that Blackmon did have some severe physical impairments, the ALJ found that her unspecified depressive disorder, adjustment disorder with anxiety, and chronic anxiety, were all non-severe because, considering them individually and in combination, they did not cause more than a minimal limitation in her ability to perform basic mental work activities. In making this finding, the ALJ considered the

---

[3] The five-step process includes evaluating: (1) whether Blackmon is "engaged in substantial gainful activity;" (2) if not, "whether [she] has a severe impairment or combination of impairments;" (3) if so, whether that impairment, or combination of impairments, meets or equals the medical listings; (4) if not, whether she can perform her past relevant work in light of her RFC; and (5) if not, whether, based on her age, education, RFC, and work experience, she can perform other work found in the national economy. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1178 (11th Cir. 2011); 20 C.F.R. § 404.1520(a)(4).

"paragraph B" criteria and found that Blackmon had a mild limitation in the domain of adapting or managing oneself, but had no limitations in any of the three other domains.  The ALJ found that Blackmon was able to maintain an independent household, and was able to attend to self-care, as well as engage in light household chores.  The ALJ noted that Blackmon was able to drive a car, shop in stores, use a computer, manage her own finances and e-mail account, take care of her granddaughter twice a week, watch television, and assemble her family tree.[4]

At step three, the ALJ found that Blackmon did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments.

At step four, the ALJ found that Blackmon had the RFC to perform sedentary work with the following limitations: she could frequently balance; occasionally stoop, kneel, crouch, crawl, climb ramps and stairs; she could never climb ladders, ropes or scaffolds; she had to avoid concentrated exposure to extremes of heat and cold, humidity, and pulmonary irritants, such as dust, odors, fumes, gases, and poor ventilation; and she had to avoid all exposure to unprotected heights and dangerous moving machinery.  In support of the RFC finding, the ALJ extensively

---

[4] The ALJ then explained that the limitations identified in the above four "paragraph B" criteria were not an RFC assessment, but rather were used to rate the severity of mental impairments at steps two and three of the sequential evaluation process.  The ALJ then stated that "[t]he following [RFC] assessment reflects the degree of limitation the undersigned has found in the 'paragraph B' mental function analysis."

reviewed the medical evidence regarding Blackmon's physical impairments and found that Blackmon's medically determinable impairments could reasonably be expected to cause the alleged symptoms, but that Blackmon's statements concerning the intensity, persistence and limiting effects of these symptoms were not entirely consistent with the medical evidence and other evidence in the record. While the ALJ did not mention Blackmon's mental impairments specifically in its RFC analysis, the ALJ again highlighted that Blackmon was able to maintain an independent household, attend to her self-care, engage in light household chores, drive, shop, use a computer, manage her own finances and an e-mail account, care for her granddaughter twice per week, watch television, and assemble her family tree.

In further support of its RFC finding, the ALJ discussed the medical opinions of Drs. Haskin, Waggoner, and Bard. The ALJ found that Drs. Waggoner and Haskin's opinions were consistent with, and supported by, the overall evidence of record and were persuasive. The ALJ found that the record showed that Blackmon was briefly treated to re-train her psychological response to pain, was following no course of psychotropic medications, was above average in intellectual function with an intact memory, and had a linear and goal-oriented thought process. The ALJ found that Blackmon was in regular contact with her family, had denied difficulties with others in past workplaces, was able to function in public places, and was described in pro-social terms. The ALJ further found that Blackmon was said to possess and exhibit typical

levels of insight and judgment sufficient to allow for decision making and problem solving.

The ALJ then noted that Dr. Bard indicated that Blackmon would have mild limitations in her ability to adapt to the stressors of day-to-day work, but no limitations in her ability to relate to others, to understand, remember and carry out instructions, and to concentrate, persist, and maintain pace. The ALJ found that, because "this opinion indicate[d] significant limitations in one of the four, psychologically based, work-related areas of function, it [wa]s only marginally consistent with, and supported by, the overall evidence of record." Therefore, the ALJ found that Dr. Bard's opinion was not persuasive.

Based on the above findings, the ALJ found at step four that Blackmon was capable of performing past relevant work as a data entry clerk, as it did not require the performance of work-related activities precluded by her RFC. Accordingly, the ALJ found that Blackmon was not disabled.

*E. Appeal to the AC*

Blackmon then sought review from the AC, providing additional evidence, including, in relevant part, an MRI from March 25, 2022.

This MRI was performed by Dr. Krikor Malajikian, M.D., and was prompted by Blackmon's long term steroid use. The MRI showed a "suspected tiny focus of avascular necrosis" along Blackmon's right hip, and a "small focus of mature appearing avascular necrosis" along her left hip.

The AC denied review on May 18, 2022, finding that there was no reason to review the ALJ's decision. As to the MRI, the AC found that, because the ALJ decided her case through August 19, 2021, "th[e] additional evidence d[id] not relate to the period at issue," and, "[t]herefore, d[id] not affect the decision of whether [she] was disabled beginning on or before August 19, 2021."

## F. District Court

Blackmon challenged this denial in the district court, asserting that: (1) the ALJ's RFC finding was deficient because it did not include limitations relating to her medically-related absences, despite the "extraordinary number" of visits and hospitalizations in the record; (2) did not include any corresponding limitations that would account for the ALJ's finding that she had mild mental limitations in the domain of "adapting or managing oneself"; and (3) the AC abused its discretion in declining to admit new and material evidence, specifically, the MRI that showed that she had "mature" avascular necrosis in her hip.

A magistrate judge issued a report and recommendation ("R&R") recommending that the AC's decision be affirmed. As to Blackmon's argument regarding absenteeism, the magistrate judge concluded that Blackmon's assertions were unsupported and waived because they were made in a perfunctory manner without legal authority. But, to the extent that they were not, the magistrate judge determined that the ALJ properly considered the nature of Blackmon's treatment, in accordance with the regulations, and noted that, "[w]hile the ALJ did not apparently

credit [Blackmon]'s testimony regarding missing work or being tardy, the ALJ did consider it and decided not to include any absenteeism or time off task in the RFC."

As to Blackmon's argument regarding her mental functioning, the magistrate judge found that, while the RFC was limited to Blackmon's physical abilities, at step four of the analysis the ALJ also considered and "discussed [Blackmon]'s ability to attend to self-care, maintain an independent household, drive, shop, manage finances, [and] care for her granddaughter," which are the same facts that the ALJ had considered when she found that Blackmon had a mild limitation in adapting and managing oneself at step two. The magistrate judge also found that the ALJ considered Dr. Bard's consultative report, and specified that it had considered all of Blackmon's symptoms in determining the RFC. Thus, the magistrate judge concluded that the ALJ adequately considered Blackmon's mental functioning, including adapting and managing oneself.

As to Blackmon's argument regarding the AC declining to admit new and material evidence, the magistrate judge found that the AC properly found that the MRI was not chronologically relevant. The magistrate judge determined that the MRI was conducted months after the period of disability, and there was no discussion in the record that explained how the results related back to a prior date. Further, the magistrate judge found that the MRI report did not reflect that Dr. Malajikian reviewed any of Blackmon's previous medical records nor was it based on findings

on Blackmon's condition before the relevant date, but rather only noted that the reason for the exam was a history of long-term steroid use. The magistrate judge also found that there was not a reasonable probability that the MRI would change the outcome of the proceedings, because Dr. Malajikian's impression that "mature appearing" avascular necrosis exists was insufficient to show that Blackmon's right hip caused a disabling limitation not accounted for in the RFC.

Blackmon objected to the R&R, reiterating the arguments from her memorandum in support of her complaint. The district court overruled Blackmon's objections, adopted the R&R, and affirmed the Commissioner's decision. Blackmon appealed.

## II.    Standard of Review

Where, as here, an ALJ denies benefits and the AC denies review, we review the ALJ's decision as the Commissioner's final decision. *Doughty v. Apfel*, 245 F.3d 1274, 1278 (11th Cir. 2001). The Commissioner's decision is reviewed "to determine whether [it] is supported by substantial evidence and whether the correct legal standards were applied." *Schink v. Comm'r of Soc. Sec.*, 935 F.3d 1245, 1257 (11th Cir. 2019). "Substantial evidence is "'such relevant evidence as a reasonable person would accept as adequate to support a conclusion.'" *Id.* (quoting *Doughty*, 245 F.3d at 1278). We may not reweigh the evidence and decide the facts anew and must defer to the ALJ's decision if it is supported by substantial evidence, even though the evidence may preponderate against it. *Dyer v. Barnhart*, 395 F.3d 1206, 1210 (11th Cir. 2005).

We review an AC's "refus[al] to consider new evidence submitted to it" *de novo*. *Washington v. Comm'r of Soc. Sec.*, 806 F.3d 1317, 1320 (11th Cir. 2015).

## III.    Discussion

On appeal, Blackmon argues (A) that the ALJ erred in its RFC by failing to include limitations (1) related to her medically-related absences and (2) mental abilities; and (B) that the AC erred in its determination that further evidence submitted by Blackmon regarding her hip impairment was not chronologically relevant and, therefore, did not affect the outcome of the ALJ's decision. We address each argument in turn.

### A.  *Whether the ALJ erred in its RFC analysis*

Blackmon argues that the ALJ's determination that she was not disabled was erroneous because the ALJ improperly determined her RFC by failing to include evidence regarding her (1) medically-related absences and (2) mental limitations in its RFC.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is disabled: (1) whether she is engaged in substantial gainful activity; (2) if not, whether she has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals the medical listings; (4) if not, whether she can perform her past relevant work in light of her RFC; and (5) if not, whether, based on her age, education, RFC, and work experience, she can perform other work found in the national economy. *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176,

1178 (11th Cir. 2011); 20 C.F.R. § 404.1520(a)(4). A person cannot be found disabled if they are engaged in substantial gainful activity, regardless of the person's medical condition, age, education, and work experience. 20 C.F.R. § 404.1520(a)(4)(i), (b).

An RFC is an assessment of an individual's ability to do sustained work-related physical and mental activities in a work setting on a regular and continuing basis. Social Security Ruling ("SSR") 96-8p (S.S.A. July 2, 1996). The assessment considers only functional limitations and restrictions that result from an individual's medically determinable impairment or combination of impairments, including the impact of any related symptoms. *Id.*

### 1. Absenteeism

Blackmon argues that the ALJ's RFC is materially deficient because it does not include any limitations relating to her medical absences despite the extraordinary number of visits and hospitalizations documented in the record. She provides that, between her original alleged onset date, June 15, 2019, and the date of the last available evidence in the record, April 22, 2021, she was variously admitted into the hospital, visiting the ER or else visiting one of her numerous primary and specialist treatment providers on at least 71 on those 677 days, which equates to 3.14 times every 30 days. She highlights that the ALJ asked the VE whether any jobs would exist for "an individual who is going to be tardy, absent, leave early, or any combination of those and if that's greater than one day a month on a regular and ongoing basis," to which the VE responded no.

The ALJ's decision not to include absenteeism limitations in Blackmon's RFC is supported by substantial evidence. Blackmon's calculation of medical events includes events that occurred before the amended onset date. Looking to the time period between September 29, 2020, (Blackmon's amended onset date) and April 22, 2021 (Blackmon's last documented medical event before filing), Blackmon had medical events on only eight days, for an average of just over 1 time per 30 days. And Blackmon had multiple medical events in just one of the months between her amended onset date and her filing, which is hardly having multiple medical events in a month on "a regular and ongoing basis." Moreover, nothing in the record shows that Blackmon could not schedule future appointments outside of work hours, schedule more than one appointment per day, or schedule appointments on her off days, which would minimize the need to miss work.[5] Accordingly, the ALJ did not err by failing to include Blackmon's absenteeism as a limitation.

## 2. Mental impairment

Blackmon next argues that the RFC finding is materially deficient because it does not include any corresponding limitations that would account for the ALJ's finding that she had "mild"

---

[5] Additionally, six of the eight appointments were 30 minutes or less, and several were virtual. Notably, the VE testified as to the employability of someone who was absent, tardy, or left work early; but the VE did not say anything about someone who missed a brief portion of the middle of the day for a scheduled or virtual appointment.

limitations in the mental-functioning domain of "adapting or managing oneself."

Paragraph (c) of 20 C.F.R. § 404.1545 addresses mental abilities, and provides that:

> When we assess your mental abilities, we first assess the nature and extent of your mental limitations and restrictions and then determine your residual functional capacity for work activity on a regular and continuing basis. A limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce your ability to do past work and other work.

20 C.F.R. § 404.1545(c).

"Consideration of all impairments, severe and non-severe, is required when assessing a claimant's RFC." *Schink*, 935 F.3d at 1268. In *Schink*, we described the level of consideration an ALJ must give to a claimant's impairments. There, the ALJ stated that it had "considered all symptoms" when assessing the claimant's RFC, but the content of the decision demonstrated that it did not, as almost all of the opinion relating to RFC discussed the claimant's physical impairments, not his mental condition of bipolar disorder nor how that disorder affected the RFC. *Id.* at 1269. We explained that, even if the ALJ had considered the mental conditions implicitly in determining the claimant's RFC, the ALJ had failed to

provide sufficient reasoning to show that the proper legal analysis had been done, which mandated reversal. *Id*. at 1269. As a result, the ALJ's assessment was "inadequate." *Id*. at 1270.

Here, the ALJ did not err in failing to include any mental limitations in Blackmon's RFC because it appropriately considered the record evidence regarding her non-severe mental impairments at step four of the sequential evaluation, and its decision is supported by substantial evidence. Recall that the ALJ reviewed the paragraph B criteria at step two, finding that Blackmon had a mild limitation in the category of "adapting or managing oneself." But what distinguishes this case from *Schink* is that, at step four in in relation to the RFC, the ALJ again reviewed Blackmon's activities related to adapting or managing herself and the persuasiveness of the psychological examiners. First, the ALJ explained that Blackmon managed her self-care, engaged in light household chores, drove a car, shopped in stores, used a computer, managed her finances, and took care of her granddaughter twice per week. And second, the ALJ explained that Drs. Haskins's and Waggoner's opinions, both of which ultimately concluded that there were no severe impairments associated with this claim, were consistent with, and supported by, the overall evidence of record and were persuasive. Thus, the ALJ here considered whether Blackmon's mental limitations affected her RFC and concluded that they did not.

Further, as briefly touched on above, substantial evidence supports the ALJ's determination that Blackmon had no mental

limitations in her RFC. *Schink*, 935 F.3d at 1257. The record evidence also shows that Blackmon was not on any psychotropic medication and that she was working on managing her psychological response to pain. Further, the record evidence showed that she is above average in intelligence and exhibited typical levels of insight and judgment to allow for decision-making and problem solving. And while Blackmon reported that, since approximately 2012 she "had bouts of depression and anxiety" in which she did not want to go to work, she had been able to maintain employment through at least June 2019. Therefore, substantial evidence supports the ALJ's decision to not include any mental limitations in Blackmon's RFC.

## B.  *Chronological relevance*

Blackmon argues that the AC abused its discretion in declining to admit "new and material" evidence showing that she had mature avascular necrosis in the right hip. She argues that, while the AC determined that the MRI "d[id] not relate to the period at issue" because the ALJ issued its decision months earlier in August 2021, the MRI in fact is new, material, and chronologically relevant evidence.

A claimant is generally permitted to present new evidence at each stage of the administrative process. *Ingram v. Comm'r of Soc. Sec.*, 496 F.3d 1253, 1261 (11th Cir. 2007). The AC must consider evidence that was not presented to the ALJ when that evidence is new, material, and chronologically relevant. *Id.*

We have explored whether evidence submitted to an AC is chronologically relevant in two published cases. In *Washington v. Soc. Sec. Admin, Comm'r*, the claimant challenged the AC's failure to consider the opinions of a psychologist who evaluated the claimant in July 2012, after the ALJ's decision, in December 2011. 806 F.3d at 1318–19. We held that a psychologist's evaluation and opinion were chronologically relevant because: (1) the claimant had described his mental symptoms during the relevant period to the psychologist; (2) the psychologist had reviewed the claimant's mental health treatment records from that period; and (3) there was no evidence of the claimant's mental decline since the ALJ's decision. *Id.* at 1322. We further noted that the holding was based on "the specific circumstances of this case." *Id.* at 1323.

In *Hargress v. Comm'r Soc. Sec. Admin.*, 883 F.3d 1302, 1305 (11th Cir. 2018), the claimant submitted medical records between March 2015 and October 2015 that post-dated the ALJ's February 2015 decision. On appeal, we held that nothing in the new medical records indicated that the doctors had considered the claimant's past medical records or that the information in them related to the period at issue, which "materially distinguished" this case from *Washington*. 883 F.3d at 1309–10. We thus held that the AC did not err in concluding that the new medical records were not chronologically relevant. *Id.* at 1310.

Here, the AC did not abuse its discretion in declining to consider additional evidence submitted by Blackmon regarding her hip impairment because this evidence is not chronologically

relevant. As with *Hargress*, there is no indication that Dr. Malajikian considered Blackmon's past medical records or indicated whether this MRI, taken seven months after the ALJ's decision, reflects Harmon's condition during the relevant time period. *Id.* at 1309–10. Further, Dr. Malajikian did not indicate whether Blackmon had any functional limitations. While Blackmon relies on the fact that the avascular necrosis appears to be "mature," she offered no evidence, in the form of medical records, to the AC regarding how long it takes for avascular necrosis to mature, or how this condition might impact her functional limitations.

For all the reasons discussed above, we affirm.

**AFFIRMED.**